# The Commonwealth *versus* Keenan and Clark.

| 67 | 203 |
|---|---|
| 126 | 204 |
| 67 | 203 |
| 134 | 342 |

| 67 | 203 |
|---|---|
| 26 SC² | 9 |

| 67 | 203 |
|---|---|
| 35 SC | 477 |

1. It is sufficient in indictments that the charge be stated with so much certainty, that the defendant may know what he is called to answer and the court how to render proper judgment.

2. In criminal pleading, courts should look more to substantial justice than artificial nicety.

3. Where no new fact is essential to the frame of an indictment for libel or to be found by the grand jury as the ground of a colloquium which cannot be dispensed with and the only object of an innuendo is to give point to the meaning of the language, it is not proper to quash the indictment on the ground that the innuendo may be supposed to carry the meaning of the language beyond the customary meaning of the word.

4. It is for the jury to say whether the meaning averred in the innuendo expresses the true meaning of the word.

5. If there be anything on the face of the libel to give color to the innuendo, it must be left to the jury.

6. A grand jury may *ignoramus* a count, but cannot find less than the whole of any one count.

7. A petit jury may find part of a count, if it be in itself a substantial offence within the charge in the indictment.

8. If some of the innuendoes in an indictment for libel extend the meaning of parts too far, but there be others sufficient to give point to it, the jury may convict under the latter alone.

9. If all the innuendoes be defective, the prosecutor has a right to proceed, to subject the defendant to costs.

10. A petit jury may impose costs on a defendant under a defective indictment.

11. Courts refuse to quash where the indictment is for a serious offence unless on the clearest and plainest ground, but will compel the party to demur, to move in arrest of judgment or to a writ of error.

12. Bornman *v.* Boyer, 3 Binn. 515, Hays *v.* Brierly, 4 Watts 392, Vanderlip *v.* Roe, 11 Harris 82, approved.

[Commonwealth *v.* Keenan.]

November 22d 1870. Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

Certiorari to the Court of Quarter Sessions of *Allegheny county*: No. 219, to October and November Term 1869.

At the June Term 1869, of the Court of Quarter Sessions of Allegheny county, a true bill was found against William W. Keenan and James H. Clark for a libel on A. M. Bowser.

The indictment contained three counts, and after charging that the defendants were the proprietors and publishers of a newspaper published at Greensburg, in the county of Westmoreland, called the "Republican and Democrat," and that the defendants intending to injure, &c., the prosecutor Bowser, and to cause it to be believed that he "was frequently prosecuted for violations of the law," published in the "Republican and Democrat," "libellous words and matter of and concerning" him, viz. :—

In the 1st count :—

"*Bowser*" [thereby meaning the said A. M. Bowser], "*again in trouble*" [thereby meaning that the said A. M. Bowser was frequently prosecuted for violations of the law]. "*On Monday last information was made before Justice Laird, of this place, by Patrick O'Conner, charging A. M. Bowser, of Irwin*" [thereby meaning the said A. M. Bowser], "*with assault and battery. The difficulty occurred at Irwin*" [thereby meaning Irwin aforesaid] "*on Saturday night, after the return, of the delegation from the Radical convention at this place*" [thereby meaning Greensburg aforesaid] "*on that day. A most brutal attack was also made on Mr. Mulligan at the same time*" [thereby meaning that the said A. M. Bowser did assault and was concerned in the assaulting of the said Mr. Mulligan at the same time that he was so falsely charged, as aforesaid, with assaulting the said Patrick O'Conner], "*stabbing him*" [thereby meaning the said Mr. Mulligan] "*once in the neck and three times in the hip*" [thereby meaning that the said A. M. Bowser was concerned in the stabbing of the said Mr. Mulligan] "*after which he*" [thereby meaning the said Mr. Mulligan] "*was conveyed to his*" [thereby meaning the said Mr. Mulligan's] "*residence, where he*" [thereby meaning the said Mr. Mulligan] "*now lies in a critical condition. The Radical Justices in Irwin*" [thereby meaning Irwin aforesaid] *refused to even hear the complaints of the persons*" [thereby meaning the said Patrick O'Conner and the said Mr. Mulligan and others whose names to the said inquest are unknown] "*assaulted. Bowser*" [thereby meaning the said A. M. Bowser] "*was held in $1000 bail by Justice Laird*" [thereby meaning the said John M. Laird, and thereby then and there meaning that the said A. M. Bowser was held to bail by the said John M. Laird for assault and battery upon the said Patrick O'Conner, and the assaulting and stabbing of the said Mr. Mulligan]."

[Commonwealth *v.* Keenan.]

The second count was substantially as the first.

The third count was :—

"*Bowser*" [thereby meaning the said A. M. Bowser] "*Again in Trouble.*"

"*On Monday last information was made before Justice Laird, of this place*" [thereby meaning John M. Laird aforesaid], "*by Patrick O'Conner, charging A. M. Bowser*" [thereby meaning the said A. M. Bowser] "*with assault and battery. The difficulty occurred at Irwin*" [thereby meaning Irwin aforesaid] "*on Saturday night, after the return of the delegation from the Radical Convention at this place*" [thereby meaning Greensburg aforesaid], "*on that day. A most brutal attack was also made on Mr. Mulligan at the same time, stabbing him*" [thereby meaning the said Mr. Mulligan] "*once in the neck and three times in the hip, after which he*" [thereby meaning the said Mr. Mulligan] "*was conveyed to his*" [thereby meaning the said Mr. Mulligan's] "*residence, where he*" [thereby meaning the said Mr. Mulligan] "*now lies in a critical condition. The Radical justices in Irwin*" [thereby meaning Irwin aforesaid] "*refused to even hear the complaints of the persons*" [thereby meaning the said Patrick O'Connor and the said Mr. Mulligan, and others whose names are to said inquest unknown] "*assaulted. Bowser*" [thereby meaning the said A. M. Bowser] "*was held in $1000 bail by Justice Laird*" [thereby meaning the said John M. Laird]."

The defendants moved to quash the indictment for the following reasons :—

"1 and 2. That the innuendo enlarges and extends the meaning of the alleged libellous words laid, beyond their common and natural sense and import, and that such enlargement of the sense and import is not covered by the introductory averment; and this as to the 1st count.

"3. That the innuendo goes beyond the natural meaning of the alleged libellous words; and that as to part of the said count, relating to Mr. Mulligan, the innuendo is wholly unsupported by any averment whatever; and that as to the 3d count, there is no libellous matter alleged therein."

The court, September 22d 1869, quashed the indictment.

The Commonwealth removed the proceedings to the Supreme Court, and assigned the order quashing the indictment for error.

*H. H. McCormick* and *L. B. Duff* (with whom was *A. L. Pearson*, District Attorney), for the Commonwealth.—An indictment will not be quashed unless defective on its face : Commonwealth *v.* Church, 1 Barr 105. The innuendo is to explain by averment words of a double or doubtful meaning : Bornman *v.* Boyer, 3 Binn. 515 ; Thompson *v.* Lusk, 2 Watts 17 ; McKennon *v.* Greer, Id. 353 ; Hays *v.* Brierly, 4 Id. 392 ; Vanderlip *v.* Roe,

11 Harris 82. The definition of libel under the Revised Criminal Code (Act of March 31st 1860, § 24, Purd. 221, pl. 26) is the same as at common law: Steele v. Southwick, 9 John. R. 214; Southwick v. Stevens, 10 Id. 443; Root v. King, 7 Cow. 613; Cooper v. Greeley, 1 Denio 347.

*W. D. Moore*, for the defendants.

The opinion of the court was delivered, January 3d 1871, by

AGNEW, J.—The strictness of criminal pleading has found its greatest rigor and its highest reason in a country where, in the time when Sir William Blackstone wrote, one hundred and sixty offences were punishable with death. Humane judges would catch at any slip when a life was to be saved. But in this state, where but a single crime is capital, and where the whole criminal code is administered in mildness and mercy, there is no such reason for strictness of pleading. Therefore it was said by Justice Sergeant, in Sherban v. Commonwealth, 8 Watts 213, that it is sufficient in indictments that the charge be stated with so much certainty that the defendant may know what he is called on to answer, and that the court may know how to render the proper judgment thereon. Over-nice exceptions, he says, are not to be encouraged, especially in cases which do not touch the life of the defendant. Following out this view, the revisers of the late criminal code gave it form and body in the 11th section of the Criminal Procedure Act of 31st March 1860, by providing that every indictment shall be deemed and adjudged sufficient and good in law which charges the crime substantially in the language of the Act of ·Assembly prohibiting the crime, or, if at common law, so plainly that the nature of the offence charged may be easily understood by the jury. The act then proceeds to direct when a motion to quash for formal defects shall be made, it shall be before the jury shall be sworn; and to provide for amendments of such defects by the court. Thus it is evident from the current both of decision and legislation, that criminal pleading is no longer the technical thing ·it was, and that courts should look more to substantial justice than artificial nicety. It may not be very important, and yet it is not amiss to say, that a libel is now a statutory offence under the 24th section of the Act of 31st March 1860.

With these principles in view it is very clear that the court below committed a grave error in quashing the indictment in this case for the reasons filed. The indictment sets forth a libel in proper form, and with sufficient averments. Where no new fact is essential to the frame of the indictment and necessary to be found by a grand jury as the ground of a colloquium which cannot be dispensed with, and the only object of introducing an

[Commonwealth *v.* Keenan.]

innuendo is to give point to the meaning of the language of the libel, it is not proper to quash the indictment on the ground that the innuendo may be supposed to carry the meaning of the language beyond the customary meaning of the words used. It belongs to the jury to say whether the meaning averred in the innuendo expresses the true meaning of the words. The intent of the author in writing the words is a question of fact and not of law, and may be drawn from intrinsic evidence. If, therefore, there be anything on the face of the libel to give color to the innuendo, it must be left to the jury to pass upon the meaning averred. It is immaterial, says Archbold, in his Criminal Pleading 463, whether the libel impute crime, &c., to the prosecutor in a direct manner, or indirectly by such hints or modes of expression as are likely to convey the intended meaning to the person to whom the libel was published; taking the words in the same sense in which the rest of mankind would ordinarily understand them, it is for the jury to say whether, in their minds, they convey the idea imputed. Therefore, where one man said of another that " his character was infamous, that delicacy forbade him from bringing a direct charge, but it was a male child who complained to him," such words were understood to mean a charge of unnatural practices, and to be sufficiently certain in themselves *without* the aid of an innuendo. It will be found, on an examination of the authorities, that this is even more emphatically the rule in this state, because the office of the innuendo has been extended beyond the limits assigned to it elsewhere. Hence, in view of the use of the innuendo as understood here, it was the right of the prosecutor in this case to have gone to the jury and asked for a conviction on this indictment, or on so much of it as under the instruction of the court they might find sufficient to support the charge of libel. In this respect the power of the petit jury is larger than that of the grand jury. Though a grand jury may ignore a count, they cannot find less than the whole of any one count; but the petit jury may find part of a count, provided the part found be in itself a substantial offence within the charge of the indictment: 1 Chitty's Crim. Law, ed. 1836, page *296. Thus, in an indictment for the larceny of a horse, saddle and bridle, the petit jury may convict of the larceny of the horse alone. So in an indictment for both an assault and battery, they may acquit of the battery and convict of the assault. A verdict of felonious manslaughter also may be rendered upon an indictment for murder. If, therefore, some of the innuendoes in this case extended the meaning of certain parts of the libel too far, but others remained sufficient to give point to it, the petit jury would have a right to convict under the latter alone. And even if all the innuendoes be defective, yet the prosecutor has a right to proceed in order to subject the defendant to costs; for even

under a defective indictment the petit jury may impose the costs upon him: Commonwealth *v.* Tilghman, 4 S. & R. 127; Commonwealth *v.* Harkness, 4 Binn. 194; Baldwin *v.* Commonwealth, 2 Casey 171. Besides, it is one of the consequences of quashing the indictment that the recognisances of the bail are discharged: 1 Chitty's C. L., ed. 1836, p. *300. And when the application comes from the defendant, says Mr. Chitty, the courts usually refuse to quash when the indictment is for a serious offence, unless upon the clearest and plainest ground, but will drive the party to a demurrer, or motion in arrest of judgment or writ of error: Chit. C. L., 1836, *300.

It remains now only to inquire as to the office of the innuendo in this state, and how far it will be permitted to be used to give point to the meaning of the words without resorting to a colloquium and a special averment of facts. After Rice *v.* Mitchell, 2 Dall. 58, the leading case is Bornman *v.* Boyer, 3 Binn. 515, in which it was held that the charge made by the defendant orally, that the plaintiff *took* his calfskin, could, by means of the innuendo, be declared that he *stole* it; and Chief Justice Tilghman, one of the most cautious of judges, held that when words will bear several meanings, the plaintiff has a right to aver by innuendo the meaning with which he conceives the words were spoken, and it is for the *jury* to decide whether he is right. This is a sensible doctrine, and much to be preferred to that nicety of description which wanders out into a maze of circumstances in order to give hue to the expression, and charge the intent with a formality more nice than wise, whose only effect will be to perplex and confound the jury. This doctrine was approved in Thompson *v.* Lusk, 2 Watts 17, in which Gibson, C. J., speaking of Bornman *v.* Boyer, and Rice *v.* Mitchell, says he would prefer to relax still further the strictness of averment formerly required, rather than to shake their authority. It was held, therefore, in that case, that the words "I have made the charge against him, and I will go on with it," spoken of the oath and testimony of the plaintiff before a justice of the peace, would support the innuendo of perjury. A charge, says the Chief Justice, imports an accusation of criminality, and the expression of a determination to go on with it, the subject of prosecution. The same question arose in McKennon *v.* Greer, 2 Watts 352. Chief Justice Gibson again delivering the opinion of the court says: The principle deducible from the decision in Bornman *v.* Boyer, 3 Binn. 515, was attempted to be ascertained in Thompson *v.* Lusk at the last term of the Sunbury District; according to which it would seem, that where the words, when considered in connection with facts and circumstances alleged *by the words themselves* to be known by the hearers and understood by them, impute the existence of guilt, which can arise but from a specific offence, the charge sup-

[Commonwealth *v.* Keenan.]

posed to result from them may be laid by an innuendo without recourse to a colloquium. The innuendo of larceny there, was supported by words which would supply the charge only by an inference to be drawn by the jury. The subject again arose in Hays *v.* Brierly, 4 Watts 392, wherein the principles of Bornman *v.* Boyer and Thompson and Lusk were reasserted. The case goes even further, for it supports a charge of libel against Brierly, the plaintiff, in a writing in which the name used was Brilery, without an innuendo and nothing to give identity to the name, but the usual charging averment of the declaration, that the libel was " of and concerning the said plaintiff." It is said there, also, that the jury may be left to judge on the *intrinsic* evidence of the paper. The last case I need notice is Vanderlip and Wife *v.* Roe, 11 Harris 82, in which it was held that a charge of fornication was sufficiently supported by an innuendo of this meaning averred of the words " she is a bad character—a loose character"—without a colloquium. The former cases are approved, and Justice Lowrie, referring to the " low slanderers" of that class, remarks " they have a *norma loquendi* that is peculiar to the class, and the meaning of such expressions may be properly averred in the innuendo, and the jury must decide whether the averment is true."

Now from these authorities there cannot be a doubt that the use of the innuendoes in this indictment was proper, and the meaning of the words averred by them should have gone to the jury. The only remaining question is, whether sufficient appears upon the face of this libel to be submitted to their finding, in support of any of the innuendoes; which if found would sustain a conviction of libel, and of this there is no doubt whatever. The publication opens with the announcement " Bowser again in trouble." What trouble? The publication proceeds to say, " On Monday last, information was made before Justice Laird, of this place, by Patrick O'Conner, charging A. M. Bowser, of Irwin, with assault and battery." No one can doubt that this indicates, with transparent clearness, the kind of trouble Bowser was in. But the assertion is, " again in trouble." Clearly this means that he had a similar trouble before. He had therefore been informed against before. No one can doubt this inference, and it was for the jury and not the court to verify it. So far it is but the assertion of a fact, but now comes the part which characterizes the fact and gives it the libellous hue. The writing proceeds to characterize the trouble Bowser was in, thus: " The difficulty occurred at Irwin, on Saturday night after the return of the delegation from the radical convention, at this place on that day." The difficulty thus stated is clearly that for which information was made against Bowser before Justice Laird. Now follows the imputation, " a most *brutal* attack was *also* made on Mr. Mulligan at the *same time*, stabbing him once in the neck, and three times

17 P. F. SMITH—14

[Commonwealth *v.* Keenan.]

in the hip, after which he was conveyed to his residence, where he now lies in a critical condition." Who can doubt that both the epithet *brutal*, characterizing the attack on Mulligan, and the description of that attack, import a most disgraceful act, one that degrades the person making the attack to the level of a brute ? It is "*brutal.*" Now when the author of the publication followed the trouble Bowser was again in, by saying, a most brutal attack was *also* made on Mr. Mulligan at the *same time,* did he not clearly and by a plain inference which all mankind would draw from the language, also characterize the attack of Bowser on O'Conner? The ordinary signification of "also" is "in the like manner," "likewise :" Webster's Unabridged Dictionary. Now if the attack on Mulligan was in like manner, or likewise, brutal, what was the other thing it was likened to ? Clearly there is nothing else than the attack by Bowser on O'Conner. That was the only other attack mentioned. Then it was beyond all doubt the province of the jury to say whether, according to the general sense and understanding of the words of this publication, the author did not intend to impute to Bowser a brutal assault and battery. If he did, then the libel is established; for he imputed a disgraceful and degrading offence to Bowser. Now suppose the petit jury should not find, as possibly they might not, the innuendo following the words, " a most brutal attack," &c., to wit, " thereby meaning that the said A. M. Bowser did assault, and was concerned in the assaulting of the said Mr. Mulligan at the same time, that he was so falsely charged as aforesaid, with assaulting the said Patrick O'Conner." Still there would be enough left to constitute a libel upon Bowser, inasmuch as the libel, by plain inference, charges him with a "brutal" assault and battery on O'Conner, and this, by the preceding part of the indictment, is averred to have been a false, scandalous, malicious, defamatory and libellous charge. The same remarks may be made upon the innuendo of the holding of Bowser to bail, to wit, that he was held to bail for the assault and battery upon O'Conner, and also for assaulting and stabbing Mr. Mulligan. If the latter part of the innuendo be disbelieved by the jury, yet enough would remain as to O'Conner. Besides, the district attorney had inserted three counts in the indictment varying the innuendoes, so that the jury could select a count and base their finding on it. In the last count there are clearly no doubtful innuendoes. The court was, therefore, in error, in quashing the indictment, on the ground that the innuendoes enlarged the meaning and intent of the alleged libel. The order of the Court of Quarter Sessions is reversed, the indictment restored, and a *procedendo* awarded.